UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-82296-RUIZ/REINHART

THERAPEUTICS MD, INC.,

               Plaintiff,

     v.

EVOFEM BIOSCIENCES, INC.,

               Defendant.

_____/

## REPORT AND RECOMMENDATION ON PARTIES' *DAUBERT* MOTIONS
## (ECF No. 111/126, 116)

Currently before me are the parties' motions to exclude expert testimony proffered by the opposing side. ECF No. 111/126, 116. These motions were referred to me by the Honorable Rodolfo A. Ruiz. ECF No. 191. I have reviewed the relevant pleadings, including expert reports and deposition testimony. For the reasons that follow, I recommend that Plaintiff's motion to exclude Defendant's experts (ECF No. 116) be DENIED and that Defendant's motion to exclude Plaintiff's experts (ECF No. 111/126) be GRANTED IN PART AND DENIED IN PART.

## LEGAL STANDARDS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that a witness who is qualified as an expert may provide an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  On a motion to exclude expert testimony under Rule 702, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires a district court to assess whether: (1) the expert is qualified to testify competently regarding the matters he intends to address;[1] (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *See United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004).  The Court acts as a gatekeeper "to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11ᵗʰ Cir. 2010) (citing *Daubert*, 509 U.S. at 597, n.13).  The Court does not assess the witness' credibility or the putative weight of the evidence; "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003).

---

[1]  In determining whether a proffered expert is qualified, the court considers his or her "knowledge, skill, experience, training, [and] education" and must "examine [his/her] credentials . . . in light of the subject matter of the proposed testimony." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 660-61 (S.D. Fla. 2012). "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Id.* (citations omitted).

The burden of establishing qualification, reliability, and helpfulness "rests on the proponent of the expert opinion." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Although sometimes helpful, a *Daubert* hearing is not necessary for the Court to fulfill its gatekeeping role of determining whether an expert's testimony meets the requirements set forth in *Daubert*. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2007) ("Although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law."); *see also United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir.2001) (holding that *Daubert* hearings are not required); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (noting that the trial court was under no obligation to hold a *Daubert* hearing). The decision of whether or not to hold a *Daubert* hearing is within the discretion of the Court. *United States v. Junkins*, 537 F. Supp. 2d 1257, 1259 n.1 (S.D. Ala. 2008) (denying the Government's requests for a hearing because it would not have materially advanced the Court's understanding of the issues). Because I do not feel a *Daubert* hearing will materially advance my understanding of the proposed expert testimony and the issues before me, I have decided to rule on the motions without holding a *Daubert* hearing.

## DISCUSSION

### *The Parties' Cross-Motions to Exclude Consumer Survey Experts*

Here, Plaintiff and Defendant each offer reports and testimony of an expert who conducted consumer surveys to determine the likelihood of confusion between Plaintiff's mark (IMVEXXY) and Defendant's mark (PHEXXI).

It is commonplace for parties to retain experts to conduct surveys designed to aid the factfinder in determining whether the confusion element of a trademark infringement claim is present. *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-CV-81606, 2019 WL 7376782, at *3 (S.D. Fla. Sept. 26, 2019) (J. Middlebrooks). There are two prominent surveys used in trademark cases to aid in establishing the "likelihood of confusion" element: the *Eveready* survey and the *Squirt* survey.

*Eveready* is "appropriate for testing alleged infringement [of] a 'top of mind' mark: one that is 'highly accessible . . . in memory, enhancing the likelihood that it will be cognitively cued by a similar junior use.'" *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2016 WL 8793317, at *12 (S.D. Fla. Jan. 7, 2016) (J. Altonaga) (citation omitted). *Eveready* "involves showing consumers only the potentially-infringing product," without showing them the senior mark, "and asking open-ended questions to determine whether they believe the product is associated with the senior mark." *Pinnacle*, 2019 WL 7376782, at *3 (*citing Parks, LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232 (3d Cir. 2017)). The *Eveready* format "does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*,

No. 1:16-CV-949-MLB, 2021 WL 2185699, at *19, n.3 (N.D. Ga. May 28, 2021) (citation omitted).

By contrast, the *Squirt* survey presents the consumer with multiple competing products, including the parties' marks, and asks consumers whether they believe any two of the products are offered by the same company. *Pinnacle*, 2019 WL 7376782, at *3 (citing 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (5th ed. 2019)). The *Squirt* test's "use of closed-ended and leading questions has been criticized by both courts and commentators because of the suggestive nature of those questions." *Pinnacle*, 2019 WL 7376782, at *4 (citing Richard J. Leighton, *Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases*, 92 TMR 743, 781 (August 2002). Moreover, courts have found that "the effectiveness of this [*Squirt*] method is diminished when the consumer is presented with the competing products in a manner different than how those products appear in the actual marketplace" because this creates an "artificial market." *Pinnacle*, 2019 WL 7376782, at *3 (quoting Jerre B. Swann, *Eveready and Squirt—Cognitively Updates*, 106 TMR 727, 743 (August 2016)). Nevertheless, experts who have conducted *Squirt* surveys are routinely permitted to present their findings to juries.

Here, Plaintiff presents Dr. Yoram (Jerry) Wind who conducted *Squirt* surveys designed to "quantif[y] the prescriber and patient confusion caused by [Defendant's] PHEXXI product samples and patient brochures." ECF No. 164 at 9. As a result of his surveys, Dr. Wind opined in his report that there was a net confusion of

approximately 20% between IMVEXXY and PHEXXI.  ECF No. 164-2 at 9.

Defendant, on the other hand, presents David Neal, Ph.D. who conducted *Eveready* surveys of pharmacists and prescribers.  As a result of his surveys, Dr. Neal opined that Defendant's use of the "PHEXXI mark . . . does not cause any material likelihood of confusion" with Plaintiff's IMVEXXY mark.  ECF No. 116-1 at 7.

Neither party disputes that the other side's consumer survey expert is qualified.  Nevertheless, both parties seek to have the other's consumer survey expert excluded, claiming that the methodology used was inappropriate given the facts and circumstances of the alleged infringement at issue here.  Below is a summary of the surveys conducted by Dr. Wind and Dr. Neal and each party's arguments in support of exclusion.

A.  Dr. Wind

Using the *Squirt* methodology, Dr. Wind first presented respondents (300 prescribers and 800 patients) with Plaintiff's mark, IMVEXXY, "as seen in the real-world marketplace."  *Id.* at 9-10.  Dr. Wind then posed "distraction questions" intended to "creat[e] a buffer period" and "reduce[] any potential order-effect bias" so that IMVEXXY receded from the respondents' immediate short-term memory before being asked questions about other products.  *Id.* at 10.  The respondents were then randomly placed in either a test group or control group.  The prescriber test group was shown product samples of PHEXXI followed by two control brands (Lo Loestrin and Premarin), while the prescriber control group was shown LEPHEL2 followed by the same control brands.  *Id.*  The patient-respondents were similarly divided and

shown these same product samples in addition to product brochures. *Id*. After viewing each brand, the respondents were asked:

> Do you believe that this product:
>
> a. Is made by the same company whose product you were shown in the first section of the survey?
> b. Is affiliated with or sponsored or approved by the company whose product you were shown in the first section of the survey?
> c. Requires permission or authorization from the company whose product you were shown in the first section of the survey?

ECF No. 164-2 at 13.  Based on the respondent's answers, Dr. Wind concluded that "there is a high likelihood of confusion between PHEXXI and IMVEXXY among both prescribers and patients." *Id*. at 9.

According to Defendant, the *Squirt* methodology used by Dr. Wind is not appropriate in these circumstances because "a side-by-side comparison of non-competing products is improper and misleading in determining likelihood of confusion . . . '[t]he marks must be compared in light of what occurs in the marketplace, not in the courtroom.'"  ECF No. 126-1 at 8 (quoting *Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d 1136, 1147 (10th Cir. 2013)).  Defendant contends that the products here are prescription drugs which are not presented to patients in the marketplace in close proximity to each other.  ECF No. 126-1 at 9.  Defendant also claims that Dr. Wind's survey is not reliable because he failed to replicate market conditions by showing respondents actual product packaging, he failed to randomize the order of the stimuli which Defendant claims "artificially inflated the level of confusion," he asked leading questions, and he failed to use control names similar to the marks at issue.  ECF No. 126-1 at 8, 15.  Defendant also contends that Dr. Wind's

patient survey should be excluded because the relevant consumers of these prescribed products are physicians and pharmacists.  ECF No. 126-1 at 19.

B.  <u>Dr. Neal</u>

For his initial report, Dr. Neal used the *Eveready* format and surveyed a total of 209 qualifying pharmacists who were randomly assigned to one of two cells (a Test Cell or a Control Cell). ECF No. 116-1 at 7.[2]  Respondents in both cells were first asked to review a particular name in the context of "a pharmaceutical drug for women's sexual and reproductive health." *Id.*  In the Test Cell, respondents saw the name PHEXXI.  *Id.*  In the Control Cell, respondents saw the name LEPHEL. *Id.* After reviewing their assigned name (PHEXXI or LEPHEL) for at least 15 seconds, respondents were asked a series of standard *Eveready* questions to identify any brand or company that they believed (a) to be the source of the named drug, or (b) to be affiliated/connected with the named drug, or (c) needed to give permission or approval to the named drug.  *Id.* at 7-8.  Dr. Neal asked the pharmacists to identify any other pharmaceutical drugs they believed were put out by the same company or brand that

---

[2]  According to his expert report, Dr. Neal surveyed pharmacists

rather than patients, because the purchase process for prescription medications is fundamentally different than for most products and services, in which the consumer is typically the party responsible for viewing, selecting, and purchasing the item in question.  In the case of prescription medications, however, a medical provider makes a diagnosis and prescribes a medication which is then transmitted . . . to a pharmacy. A pharmacist then reviews the prescription and dispenses the medication.  Thus, the pharmacist is a critical and necessary step in the purchase process and any material confusion caused by the PHEXXI mark could potentially alter pharmacists' dispensing decisions . . .

ECF No. 116-1 at 6.

puts out, or were affiliated/connected with, or needed to give permission/approval to the named drug. *Id.* None of the participants named Plaintiff or IMVEXXY in response to the questions Dr. Neal posed. *Id.* at 9-10.

For his rebuttal report, Dr. Neal again used the *Eveready* format and surveyed 200 prescribers of contraceptive drugs. ECF No. 116-2 at 3. As with the pharmacists in his initial survey, Dr. Neal divided them into Test and Control Cells, displayed the same names and asked the same questions. *Id.* According to Dr. Neal, this survey "replicate[d] and reaffirm[ed] my original conclusion" in that zero percent of U.S. prescribers were likely to confuse PHEXXI with Plaintiff and/or IMVEXXY. *Id.*

Relying on Dr. Wind's deposition testimony, Plaintiff contends that *Eveready* is an inappropriate methodology to use in these circumstances because despite IMVEXXY being a "strong brand" that has been "out for a few years in the market," it has "not achiev[ed] a top-of-mind awareness" because the "level of marketing . . . is minute." ECF No. 126-3 at 15.

Plaintiff also seeks to exclude Dr. Neal's testimony because "his surveys materially deviated from the well-established *Eveready* format" in that he did not show Defendant's product packaging to the survey participants (thereby failing to realistically replicate marketplace conditions) and he used leading questions that limited the respondents' thinking to drugs prescribed only for "women's sexual and reproductive health" which Plaintiff claims biased the survey. ECF No. 116 at 6-10.

Dr. Neal conducted a third survey, which he called the "Corrected Wind Survey" wherein he modified the *Squirt* prescriber survey conducted by Dr. Wind.

9

Dr. Neal attempted to "correct" Dr. Wind's survey by employing different randomization procedures, showing respondents the product packaging for IMVEXXY and PHEXXI as they are sold commercially (as opposed to product samples), and showing all six sides of the packaging.  Dr. Neal contends that his "corrections" resulted in "the absence of confusion" among prescribers.  ECF No. 116-2 at 5.  Plaintiff rejects this "Corrected Wind Survey" as unreliable because Dr. Neal failed to replicate market conditions when he showed the prescribers packaging that they do not encounter in the marketplace.  ECF No. 116 at 12.

The parties' disputes over the proper survey to use, the relevant consumer to be surveyed, the actual marketplace to be replicated, the appropriate packaging and product names to be presented to the respondents, the form of questions to be asked, etc. do not render any results of these surveys inherently unreliable such that they should be deemed inadmissible under *Daubert*.  Disputes over the parameters used in each survey are not an adequate basis to exclude the surveys and their results from the jury.  Rather, these issues go to the weight a jury decides to afford the expert's testimony and are more properly addressed through "vigorous cross-examination [and] presentation of contrary evidence."  *Quiet Tech. DC-8, Inc.,* 326 F.3d at 1341. (11th Cir. 2003).

Both the *Squirt* and *Eveready* methodologies have been deemed acceptable by courts and are frequently used in trademark infringement cases as a means of assisting the factfinder in assessing likelihood of confusion.  Admittedly, both methodologies have their flaws.  *Squirt* has been criticized for its leading questions

and creation of an artificial marketplace.  Likewise, *Eveready*'s usefulness in a case like this is debatable given the survey's reliance on the senior brand being so well-recognized that survey participants do not even need to be reminded of its existence before responding to questions about possible confusion.  Nevertheless, the prejudice to either side is mitigated by the fact that both methodologies will be presented.  Thus, I find that the reports and testimony of Dr. Wind and Dr. Neal should be presented to the factfinder who can choose to credit or disregard either or both experts' results and opinions.  Simply put, each party has satisfied its burden of showing that its expert should not be excluded based on *Daubert*.

<u>*Defendant's Motion to Exclude Plaintiff's Other Experts*</u>

A.  *Dr. Delia DeLeon*

Plaintiff presents the testimony of Dr. DeLeon, a practicing OBGYN for the past twelve years, as a rebuttal to Dr. Neal's testimony.  Dr. DeLeon sees approximately 80 patients per week and prescribes drugs to women in all stages of their lives, including hormone replacement therapies such as IMVEXXY and contraceptives such as PHEXXI.  ECF No. 146 at 26.  Plaintiff proffers Dr. DeLeon's testimony to describe "the decision-making process . . . between doctors and their patients before writing a prescription" and "the lack of influence that pharmacists have in the . . . process" for purposes of discrediting Dr. Neal's survey of pharmacists.  *Id.*; ECF No. 119-6.

Defendant contends that Dr. DeLeon is not qualified to opine on who is the relevant consumer in this lawsuit and that in any event, her opinion is moot since Dr. Neal later expanded his survey to include prescribers.

I find that pursuant to the criteria set forth in *Daubert,* Dr. DeLeon's report should be deemed inadmissible. Even assuming that Dr. DeLeon's experience qualifies her to render an opinion on the topics in her report, I find that her testimony would not be helpful to the factfinder. It is reasonable to presume that the factfinder will have had personal interactions with doctors and pharmacists and is familiar with how medical prescription decisions are made. This information is not beyond the province of the factfinder.

When the trier of fact is "entirely capable of determining" issues in the case "without any technical assistance from . . . experts," expert testimony is unhelpful and must be excluded from the evidence. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998); *see also United States v. Rouco*, 765 F.2d 983, 996 (11th Cir. 1985). "Otherwise, there is a risk the trier of fact will give the expert testimony undue weight on account of [her] special status." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) (expert testimony is not helpful when it offers nothing more than what lawyers provide in closing arguments)).

B. *Dr. Sandra Disner*

Plaintiff presents the testimony of Dr. Disner, who is a linguist with over 35 years of experience. She analyzed the alleged orthographic and phonetic similarities

12

of IMVEXXY and PHEXXI and opined that the marks share numerous similarities, "including (i) similar letters; (ii) similar sounds; (iii) similar word stresses; (iv) interchangeability of some of the sounds; (v) unique distribution of other sounds (such as -xx-); and (vi) auditory weakness of the first syllable – [that] make it difficult to distinguish PHEXXI from IMVEXXY."  ECF No. 111-9 at 4-5.

Defendant contends that Dr. Disner "improperly focuses on the micro-details of the marks (e.g., that i and y are interchangeable), rather than on how the marks are perceived in the marketplace by relevant consumers."  ECF No. 111 at 22. Defendant argues that her report is misleading and confusing because her analysis "leav[es] aside the prefix IM" from IMVEXXY based on her opinion that the prefix "is an unfooted, unstressed syllable."  *Id.* citing ECF No. 111-9 at 5.  Defendant objects that Dr. Disner only listened to YouTube commercials to hear how Plaintiff wanted IMVEXXY pronounced, but that she did not consult physicians, pharmacists or the general public about the pronunciation.  Defendant also contends that Dr. Disner is unqualified to opine on the FDA's Proprietary Name Review process or the USPTO's trademark review process.

With regard to Dr. Disner's opinion regarding the similar sounds and appearance of the two marks, I note that Defendant does not specifically object to her qualifications or the reliability of her methodology.  Instead, Defendant merely offers criticisms as to how Dr. Disner's methodology could have been improved.  Having reviewed her qualifications and the methodology set forth in her report, I find that Dr. Disner is qualified to opine on these topics, and that she has provided an adequate

basis for her conclusions so as to render them reliable.  Moreover, I find that this testimony could be helpful to the jury in assessing the likelihood of confusion between the two marks.  To the extent that Defendant disagrees with certain aspects of Dr. Disner's methodology, that is properly addressed on cross-examination.

As for Dr. Disner's criticisms of the FDA and USPTO's processes (ECF No. 111-9 at 11-23), I find that these portions of her report should be stricken.  I am not convinced that Dr. Disner is qualified to opine on these processes; nor am I convinced that this testimony would be helpful to the factfinder.

First, based on Dr. Disner deposition testimony, it appears that she does not have adequate training or experience with the FDA's Proprietary Name Review or its POCA software to opine on its usefulness.  *See* Disner Dep Tr. 75:4-15; 123:9-22 (ECF No. 111-10 at 10, 14).  Second, even assuming Dr. Disner was qualified to offer limited testimony regarding her assessment of the phonetic and orthographic components of the FDA's review process, her testimony would not be relevant or helpful to the factfinder because the FDA review is for a distinct purpose, namely, to "determine whether a name presents a safety concern from a look-alike or sound-alike perspective." ECF No. 125-5 at 12.  Courts have rejected similar claims by defendants that there could be no confusion under the Lanham Act because "[t]he FDA and the USPTO have determined that the marks are not confusingly similar," noting that "neither of those proceedings can supplant the required Lanham Act analysis [because] the FDA applies a standard different . . . review[ing] proposed drug names

'to predict potential confusion that may arise in the actual prescription process.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004).

Ultimately, it is for the finder of fact to decide the likelihood of confusion between the two marks and here, the factfinder may be unduly influenced by the determinations of these government agencies and/or Dr. Disner's criticisms of them. Similarly, I find the helpfulness (and relevance) of Dr. Disner's testimony regarding the USPTO's rejection of the VEXXY mark years earlier by a different applicant to be dubious at best.  ECF No. 111-9 at 21-23.

C.  *Dr. Jennifer Vanderhart*

Plaintiff presents the testimony of Jennifer Vanderhart, Ph.D., an economist, to opine about the damages Plaintiff has incurred as a result of Defendant's alleged infringement of Plaintiff's mark.  ECF No. 127-2.  According to Dr. Vanderhart, Plaintiff is entitled to recover $1.43 million in corrective advertising damages from Defendant.  *Id.* at 29.

Defendant objects to Dr. Vanderhart's testimony, arguing that corrective advertising damages are only appropriate if Plaintiff can demonstrate that current or potential customers of a competing product changed their purchasing decisions as a result of false advertising.  ECF No. 111 at 24.  Defendant argues that Dr. Vanderhart's report does not specify Plaintiff's lost sales or economic harm caused by Defendant's marketing of PHEXXI.

"In actions brought for infringement under the Lanham Act, damages consist of '(1) the defendant's profits, (2) any damages sustained by the plaintiff and (3) the

cost of the action,' and include all elements of injury to the plaintiff's business, such as the costs of corrective advertising or injury to business reputation or good will." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1279 (S.D. Fla. 2013) (quoting *Aronowitz v. Health–Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (affirming corrective advertising damages award based on CFO's testimony estimating costs of developing corrective website, running ads in trade publication, and attending industry trade shows to address confusion caused by website with infringing name).

"Corrective advertising is a remedy that seeks to counteract public confusion resulting from trademark infringement." *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* No. 04 CIV. 7203 (DLC), 2006 WL 1359955, at *1 (S.D.N.Y. May 18, 2006) (citing *Lurzer GMBH v. American Showcase, Inc.*, 75 F. Supp. 2d 98, 101 (S.D.N.Y. 1998)). It is a monetary award intended to restore a mark to its original value. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992). This remedy is separate from reimbursement for past advertising costs that were incurred "concurrent with the wrong;" an award for corrective advertising is to compensate a plaintiff for future expenditures and has been described as "an extraordinary remedy reserved for cases in which a plaintiff lack[ed] financial ability to pay for reparative ads." *Juicy Couture, Inc.,* 2006 WL 1359955, at *1 (citing *Lurzer GMBH*, 75 F. Supp. 2d at 101). *See also Zazu Designs*, 979 F.2d at 507 (reversing award of corrective advertising damages where plaintiff could afford to conduct a corrective campaign but did not, suggesting that either plaintiff was not injured or that it would be cheaper to use a new name

16

than to correct any confusion); *PBM Prod., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001) ("in order for a plaintiff to recover purely prospective corrective advertising expenditures, he or she must prove that such expenditures are corrective, . . . are a surrogate for measuring plaintiff's actual damages, . . . and that financially, he or she is unable to undertake a corrective advertising campaign concurrently with the wrong") (citations omitted). *But see Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 988–89 (9th Cir. 1995) (holding that prospective corrective advertising expenditures are compensatory damages, that should be awarded irrespective of whether the plaintiff lacks the finances to conduct a corrective advertising campaign before trial).

Corrective advertising damages are usually awarded where the alleged infringement involves competing products. *See, e.g., I'M A Little Teacup Corp. v. Quality Pet Prod., LLC*, No. 08-60446-CIV, 2009 WL 837658, at *1 (S.D. Fla. Mar. 27, 2009) (awarding corrective advertising damages because defendant's infringement "lured potential customers away" who otherwise, "may well have decided to use Plaintiff's product"); *Juicy Couture, Inc.*, 2006 WL 1359955, at *3 (finding an award for corrective advertising damages in cases involving non-competing products "would be nothing more than a windfall").

Notably, Defendant does not object to Dr. Vanderhart's qualifications or methodology for calculating these damages. Defendant's primary objection is that there is no legal or factual basis for Dr. Vanderhart's testimony about Plaintiff's alleged corrective advertising damages. This argument is not persuasive. As the

cases above reflect, the Eleventh Circuit permits recovery of corrective advertising damages, and it has not specifically limited such recovery to infringement involving competing products or to plaintiffs who are financially incapable of engaging in a corrective campaign prior to trial. Accordingly, I find that Dr. Vanderhart should be permitted to testify regarding Plaintiff's entitlement to recover these damages, provided Plaintiff proffers the necessary foundational testimony at trial to support Dr. Vanderhart's opinion regarding the amount of damages owed. *See* Plaintiff's Response in Opposition (ECF No. 146 at 30) (Plaintiff's "evidence of harm" will be established by other witnesses).

*Plaintiff's Motion to Exclude Defendant's Expert – Jeff Anderson*

Defendant presents the testimony of Mr. Anderson, who is the managing director of an intellectual property asset consulting firm specializing in trademark, copyright, and rights of publicity valuation and licensing. ECF No. 141 at 16. He is also a Certified Licensing Professional, and a Certified Valuation Analyst. *Id.* Mr. Anderson has written and lectured on the valuation of intellectual property and has served as an expert witness in 48 cases since 2012. ECF No. 116-11. Defendant seeks to have Mr. Anderson rebut Dr. Vanderhart's testimony by opining that corrective advertising is unnecessary because Plaintiff has not established any economic harm or reduction in the value of the IMVEXXY trademark as a result of Defendant's mark PHEXXI.

Plaintiff contends that Mr. Anderson is unqualified to testify about the sufficiency of evidence to justify corrective advertising damages. ECF No. 116 at 16.

According to Plaintiff, during his deposition Mr. Anderson was unable to name the types of harm courts have found to justify corrective advertising (i.e., impact on the distinctiveness of the brand, creation of a false association between two products, and customer confusion).  *Id.*

Given Mr. Anderson's substantial experience, and that the standard for determining whether a proposed expert is qualified is "not stringent," I find that Mr. Andersen is sufficiently qualified to opine on whether corrective advertising damages are warranted here.  I do not agree with Plaintiff that he should be stricken simply for being unaware of what other courts in this district have deemed acceptable proof of damages.

Plaintiff also contends that Mr. Anderson's opinions are unreliable because they include an erroneous assumption – that a party must be able to quantify the harm/reduction in value, before being entitled to damages for corrective advertising. *Id.* at 17.  According to Plaintiff, courts do not require the owner of an infringed mark to quantify the diminished value before awarding corrective advertising damages.

In his report, Mr. Anderson states: "there is no evidence that [Plaintiff] has suffered any economic harm or experienced a reduction in the value of their IMVEXXY trademark." ECF No. 116-11 at 15.  According to Mr. Anderson, a plaintiff must establish some harm before corrective advertising damages can be assessed.  I find this to be proper rebuttal testimony to Dr. Vanderhart's opinion and I reject Plaintiff's contention that Mr. Anderson's methodology is unreliable.

Finally, I reject Plaintiff's argument that Mr. Anderson should be precluded

from espousing an alternative method for valuing Plaintiff's damages because it was not disclosed in Defendant's initial expert reports. Specifically, at the end of his report, Mr. Anderson states that "[a]n alternative measure of the potential value of the Plaintiff's mark that was lost due to the alleged infringement . . . [is the] royalty valuation methodology." ECF No. 116-11 at 14. According to Mr. Anderson's calculations, "[t]he apportioned value received by Evofem for their use of the PHEXXI mark is between $102,240 and $131,732." *Id.* at 15.

I find that Dr. Vanderhart's report opining that Plaintiff is entitled to substantial corrective advertising damages opened the door for Defendant to present alternative damages calculations. Rule 26 provides that rebuttal experts may be permitted to present evidence that contradicts or rebuts evidence on the same subject matter identified by an initial expert witness. Fed. R. Civ. P 26(a)(2)(D)(ii). Neither the Rules nor the Eleventh Circuit has defined or explained the term "same subject matter." *Northrup v. Werner Enter., Inc.*, No. 8:14-CV-1627-T-27JSS, 2015 WL 4756947, at *2 (M.D. Fla. Aug. 11, 2015). Having reviewed the relevant caselaw, I am persuaded by other courts that have broadly construed the term "same subject matter" and I conclude that Mr. Anderson's proposed alternative damages based on royalty valuation address the same general subject matter as Ms. Vanderhart, namely, the amount of damages Plaintiff may be awarded to compensate it for any alleged infringement. *Id.* (citing *Armstrong v. I–Behavior Inc.*, No. 11–cv–03340– WJM–BNB, 2013 WL 2419794, at *4 (D. Colo. June 3, 2013) (declining to confine the term "same subject matter" in an overly restrictive manner); *1550 Brickell Assocs. v.*

*QBE Ins. Corp.*, No. 07–22283–CIV, 2010 WL 1947636, at *2 (S.D. Fla. May 13, 2010) ("same subject matter" should not be so narrowly construed as to impose additional restrictions on the parties); *TC Sys. Inc. v. Town of Colonie,* 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002) (declining to construe the term narrowly on the basis that doing so would "impose an additional restriction on the parties that is not included in the Rules")).

Similarly, I reject Plaintiff's arguments that Mr. Anderson's opinions do not reflect the breadth of damages available to Plaintiff under the law, would not be helpful to the factfinder, and that his calculations are based on incomplete or faulty assumptions. Defendant states that Mr. Anderson based his calculations on financial documents Plaintiff publicly filed with the SEC. ECF No. 141 at 20. To the extent Plaintiff contends that Mr. Anderson's calculations do not reflect the costs Plaintiff incurred in acquiring its trademark portfolio, this can be properly addressed on cross-examination. In sum, Plaintiff's objections go to the weight of Mr. Anderson's testimony and are insufficient to render it inadmissible for purposes of *Daubert*.


## RECOMMENDATION

Based on the foregoing, I RECOMMEND that Plaintiff's motion to exclude Defendant's experts (ECF No. 116) be **DENIED** and that Defendant's motion to exclude Plaintiff's experts (ECF No. 111/126) be **GRANTED IN PART AND DENIED IN PART** in that the report and testimony of Dr. DeLeon be excluded as well as the portion of Dr. Disner's report that criticizes the processes of the FDA and

USPTO.

### <u>NOTICE OF RIGHT TO OBJECT</u>

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Rodolfo A. Ruiz, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE and SUBMITTED** in Chambers this 29th day of March, 2022, at West Palm Beach in the Southern District of Florida.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE