IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-82296-RUIZ/REINHART

THERAPEUTICS MD, INC.,

                Plaintiff,

    v.

EVOFEM BIOSCIENCES, INC.,

                Defendant.

_____/

## REPORT AND RECOMMENDATON ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 112, 128-1)

Presently before me are Plaintiff's Motion for Partial Summary Judgment (ECF Nos. 128-1) and Defendant's Motion for Summary Judgment (ECF No. 112), which the Honorable Rodolfo A. Ruiz referred to me for a Report and Recommendation. ECF No. 191.

With its motion, Defendant seeks summary judgment in its favor on all six of the claims in Plaintiff's First Amended Complaint (FAC) (ECF No. 37) and on its Counterclaim (ECF No. 29 at 9).[1] Plaintiff's motion seeks summary judgment in its

---

[1] The FAC alleges claims for trademark infringement under 15 U.S.C. §1114 (Count I), unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (Count III), a violation of Florida's Deceptive & Unfair Trade Practices Act (FDUPTA) (Count III), and a Florida common law claim for trademark infringement and passing off (Count IV). ECF No. 37. Counts V and VI seek cancellation of Defendant's trademark under 15 U.S.C. § 1119 and for fraud on the USPTO. *Id.* Defendant's counterclaim

favor on Defendant's first, second, and fourth affirmative defenses (ECF No. 110 at 10-12)[2] and Defendant's counterclaim.  I have reviewed the pleadings, motion papers, Statements of Material Facts, and attached exhibits.

These matters are now ripe for decision.  For the reasons that follow, I recommend that Plaintiff's motion (ECF No. 128-1) be **GRANTED IN PART AND DENIED IN PART** and that Defendant's motion (ECF No. 112) be **DENIED.**

## BACKGROUND

This litigation involves two distinct medical products available to women by prescription only.  Plaintiff's product, IMVEXXY, is a dissolvable vaginal insert that was approved by the FDA in May 2018 for treatment of vaginal pain during sexual intercourse due to menopause.  ECF No. 37 at ¶¶ 9, 11.  Plaintiff registered the mark IMVEXXY with the USPTO on February 7, 2017.  *Id.* at ¶ 12.  According to Plaintiff, "the IMVEXXY mark evokes a connotation of 'sexy' in the context of women's sexual and reproductive health."  *Id.* at ¶ 15.

Defendant's product, PHEXXI, is a vaginal gel that is FDA-approved for the prevention of pregnancy.  ECF No. 37 at ¶ 98; Exhibit L.  Defendant registered its PHEXXI mark with the USPTO in November 2020 (the '656 Registration).  ECF No.

---

seeks cancellation of Plaintiff's trademark registration for abandonment/non-use. ECF No. 29 at 12.

[2]  The challenged affirmative defenses are for waiver, laches and estoppel (First Aff. Def.), invalidity of Plaintiff's trademark registration due to abandonment (Second Aff. Def.), and unclean hands (Fourth Aff. Def.).  ECF No. 110 at 11-12.  Plaintiff has also filed a Motion to Strike Defendant's Fourth Affirmative Defense.  ECF No. 124.

37 at ¶ 29.[3]  According to Plaintiff, PHEXXI also "evokes connotations of sexy."  *Id.* at ¶ 21.

In the FAC, Plaintiff argues that there is a likelihood of consumer confusion between the two marks because the IMVEXXY and PHEXXI marks are "confusingly similar in appearance, sound, and overall connotation . . . when used in connection with pharmaceutical drugs for women's sexual and reproductive health."  *Id.* at ¶¶ 21, 22.  Plaintiff contends that "[t]hese similarities in appearance and sound not only present the risk that consumers will request the wrong drug and/or doctors will prescribe the wrong drug, but also the likelihood that pharmacists may dispense the wrong drug."  *Id.* at ¶ 20.  According to Plaintiff, the two products are "closely related," "prescribed by the same physicians . . . [and] prescribed to the same class of patients . . ."  ECF No. 37 at ¶¶ 40, 42.

In the FAC, Plaintiff contends that Defendant infringed on its mark "despite its awareness of [Plaintiff's] superior trademark rights," thus causing Plaintiff irreparable harm.  ECF No. 37 at ¶¶ 46, 47.  Plaintiff seeks injunctive relief permanently enjoining Defendant from using the PHEXXI mark, an order cancelling Defendant's registration and applications with the USPTO, disgorgement of Defendant's profits from its use of the PHEXXI mark, and an award of monetary damages.  ECF No. 37 at 26-28.

---

[3]   Defendant subsequently filed trademark applications for stylized designs of the PHEXXI mark with the USPTO (the '069 Application and the '879 Application).  ECF No. 37 at ¶¶ 30, 31.

In its motion for summary judgment, Defendant contends that Plaintiff has not established that there is a likelihood of confusion between the two marks and therefore judgment should be entered in its favor on Counts I-V of the FAC. Defendant further contends that Count VI which seeks cancellation of its trademark for PHEXXI should be rejected and that it should prevail on its Counterclaim which seeks cancellation of Plaintiff's trademark for IMVEXXY.

## UNDISPUTED FACTS

PHEXXI is prescribed to women of child-bearing age.  Defendant's Statement of Facts (Def. SOF) (ECF No. 125-1) at ¶ 2.  IMVEXXY is FDA-approved for women who are experiencing symptoms of menopause.  *Id.* at ¶ 3.  The packaging that goes inside every box of IMVEXXY states that "IMVEXXY is not indicated for use in females of reproductive potential."  ECF No. 37, Ex. C at 12.

Defendant chose the name PHEXXI because it "began with 'pH,' which refers to the drug's . . . maintaining a vaginal pH at a level that inhibits the motility of sperm . . . it incorporated an 'XX,' which symbolizes the female chromosome" (ECF No. 125-8 at 4), and because "it rhymes with 'sexy'" (ECF No. 166-6 at 10).  Def. SOF at ¶ 13; Plaintiff's Additional Facts (PAF) ¶ 61.

Both products are dispensed in pharmacies and each company's sales representatives visit many of the same OB/GYN offices to educate prescribers about their drug's use and to provide sample products for the prescribers to give to patients.  PAF ¶¶ 65-67, 69.  Both products are also directly marketed to patients.  PAF ¶ 80.

4

The way the PHEXXI and IMVEXXY marks appear in the marketplace differ in font and color.  Def. SOF ¶ 22; FAC ¶¶ 10, 25.

Defendant submitted the PHEXXI mark to the FDA for its approval and the FDA conducted a Proprietary Name Review which compared the sound, appearance, and product characteristics of PHEXXI and IMVEXXY; the FDA concluded that there were "sufficient differences" between the two.  ECF No. 125-5.  In conducting its assessment, the FDA used its Phonetic Orthographic Computer Analysis (POCA) software program and gave the PHEXXI/IMVEXXY name pair a score of 59% which corresponds to the category of "moderately similar names."  *Id.* at 19.[4]  The FDA's threshold for "high similarity" is 70%.  Defendant's Additional Facts (DAF) ¶ 56.

Defendant's branding company, The Brand Institute, emailed Defendant in November 2019 regarding possible bases for the FDA to reject the PHEXXI name. ECF No. 166-4.  One reason the email noted was "some concern with the similarity of IMVEXXY (already FDA approved) and PHEXXI."  *Id.*  The email explained,

> A POCA screen calculated an ortho similarity of .54 and a phono similarity of .64.  These scores are well within range of acceptability. Again, please note that POCA is one element of a multi-faceted review process – however, we do agree that they appear to sound more similar than the phono POCA score indicates.

*Id.*

Plaintiff owns a registered trademark for IMVEXXY, which is a distinctive and made-up word.  PAF ¶¶ 56, 57.  During the prosecution of its PHEXXI trademark

---

[4]  Although Plaintiff purports to dispute the way Defendant characterized these facts in its SOF, there is no dispute as to the underlying facts themselves.

applications with the USPTO, Defendant did not inform the USPTO of Plaintiff's IMVEXXY registration.  ECF No. 37 at ¶ 35.  Plaintiff contacted Defendant in May 2020, regarding Plaintiff's concerns about the likelihood of confusion between the two marks.  Plaintiff's SOF ¶ 11; DAF ¶ 62, 63.  Plaintiff launched PHEXXI in the marketplace on September 8, 2020.  Plaintiff's SOF ¶ 16.  Plaintiff filed the instant lawsuit on December 14, 2020.  ECF No. 1.

## DISPUTED FACTS

### *Do the products compete and what is the impact of Defendant's product on Plaintiff's business?*

Defendant argues that the parties' products treat different medical concerns and they are marketed and prescribed to females at vastly different stages of their lives.  Def. Resp. to PAF ¶ 70.  Defendant contends that because of their different purposes, the two products are not competing products and there is no evidence of confusion (nor likelihood of confusion) by patients, prescribers or pharmacists. Plaintiff contends that IMVEXXY and PHEXXI target overlapping female age groups and that both products could potentially be prescribed to the same patient.  ECF No. 166-2 at ¶¶ 5, 6, 26; PAF ¶ 70.

Defendant claims that Plaintiff cannot prove that PHEXXI has had any impact on its business or caused lost sales.  Def. SOF ¶¶ 17, 18, 28.  Plaintiff contends that "Evofem's conduct has harmed and did impact IMVEXXY sales."  Plaintiff's Response to Def. SOF ¶ 28; PAF ¶ 84.

_Who is the relevant consumer and is there evidence of confusion?_

Defendant's expert surveyed pharmacists and prescribers and found no confusion between the two products. Def. SOF ¶¶ 29-32, 34.  Plaintiff contends that pharmacists are the "wrong universe for studying likelihood of confusion."  _Id._

Plaintiff's expert surveyed prescribers and patients and found a net confusion rate of approximately 20%.  ECF No. 164-2 at 9.  Defendant contends that patients are not the relevant consumers because "patients do not choose (or write) their own prescriptions."  ECF No. 112 at 14.

Defendant contends that Plaintiff's witnesses "testified that they were not aware of a single instance" of patient confusion (Def. SOF ¶ 33), but Plaintiff counters that it has identified over 24 pharmaceutical sales representatives who describe instances of confusion by prescribers and their office staff, whom Plaintiff contends are also prospective patients.  Plaintiff's Resp. to Def. SOF ¶ 33; PAF ¶ 77.  Plaintiff has provided sworn declarations and deposition testimony from many of these sales reps.  ECF Nos.166-20, 166-21, 167-1 through 167-17.  According to Defendant, at least one of the physicians identified in a sales representative's declaration as having been confused, later denied ever being confused by the two products.  Def. SOF ¶ 39, ECF No. 125-21.  Defendant contends that the sales representatives' declarations describe instances of "momentary, fleeting confusion" (Def. SOF ¶ 42), but Plaintiff refutes this claim with two instances where the doctors left the conversation before their confusion was corrected.  Plaintiff's Resp. to Def SOF ¶ 42.

*Defendant's Intent*

Plaintiff contends that internal emails from Defendant's employees demonstrate concern about the similarity of the names PHEXXI and IMVEXXY, but that Defendant chose to use the PHEXXI name anyway. Plaintiff's SOF ¶ 7; PAF ¶ 60; ECF No. 166-8. Defendant counters that these emails predate the approval of its mark by the FDA and USPTO which resolved the issue and alleviated all of Defendant's concerns. Def. Resp. to Plaintiff's SOF ¶ 7.

*Corrective Advertising Damages*

Defendant contends that Plaintiff does not allege lost sales and only seeks corrective advertising damages, which are improper because the two products are not direct competitors. Def. SOF ¶¶ 46, 47. Plaintiff counters that Defendant improperly attributes its claim regarding no lost sales to Plaintiff's corporate representative who was not designated to give deposition testimony about product sales. Plaintiff's Resp. to Def. SOF ¶ 46.

*Cancellation of Trademarks*

To the extent each side seeks to cancel the other's trademarks (Count VI of the FAC and Defendant's Counterclaim), they dispute the facts underlying each claim. Defendant argues that the claims made in its Statement of Use filed with the USPTO are true and that its general counsel believed them to be true when he submitted the application. Def. SOF ¶¶ 49, 50. Plaintiff counters that Defendant relies on clinical trial of a different drug to support its claim that PHEXXI creates an environment inhospitable to certain pathogens and that this is insufficient to render its Statement

of Use true.  Plaintiff's Resp. to Def. SOF ¶ 49; PAF ¶¶ 88, 89.  Plaintiff further contends that Defendant's general counsel knew the Statement of Use was not accurate when he signed it because he testified that the statement included uses that were "aspirational" and relied on "R and D goals."  Plaintiff's Resp. to Def. SOF ¶ 50.

With regard to Defendant's Counterclaim that Plaintiff's trademark for IMVEXXY should be cancelled, Defendant contends that Plaintiff's Statement of Use to the USPTO differs from the FDA-approved uses for IMVEXXY because it does not treat all the symptoms of vulval vaginal atrophy (VVA).  Def. SOF ¶¶ 53-55; Def. Resp. to PAF ¶ 87.  Plaintiff rejects this claim, arguing that IMVEXXY treats all symptoms of VVA.  Plaintiff's SOF ¶ 34, Plaintiff's Resp. to Def. SOF ¶ 54; PAF ¶ 87.

## **LEGAL PRINCIPLES**

### *Motion for Summary Judgment*

The legal standard for summary judgment is well-settled:

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." A fact is material if it "might affect the outcome of the suit under the governing law." The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.

\*                          \*                          \*

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" Accordingly, the non-moving party must produce evidence, going beyond the

> pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor.

*Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom) (citations omitted).

> The moving party's burden on a motion for summary judgment "depend[s] on whether the legal issues ... are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). "For issues, however, on which the non-movant would bear the burden of proof at trial, 'the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility.'" *Id.* (quoting *Four Parcels*, 941 F.2d at 1437–38).

*Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260 (S.D. Fla. 2020) (J. Singhal).

### *Lanham Act*

Under the Lanham Act, a defendant is liable for infringement if, without consent, he uses "in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark" which is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To prevail on a federal trademark infringement claim and false designation of origin claims (here, Counts I and II), a plaintiff must demonstrate (1) that its mark has priority, and (2) that the defendant's mark is likely to cause consumer confusion. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat. Univ., Inc.*, 91 F. Supp. 3d 1265, 1274 (S.D. Fla. 2015) (citing *Frehling Enters.,*

*Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999)); *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.,* 508 F.3d 641, 647 (11th Cir. 2007).[5]

The Eleventh Circuit has set forth the following seven factors for courts to consider when determining whether or not a likelihood of consumer confusion exists: (1) strength of the mark alleged to have been infringed;[6] (2) similarity of the infringed and infringing marks; (3) similarity of the products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising methods; (6) the defendant's intent; and (7) actual confusion. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1280-81 (11th Cir. 2020). Of these factors, the strength of the senior mark and evidence of actual confusion are considered the most important. *Id.*

"Although likelihood of confusion is a question of fact, it may be decided as a matter of law." *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2019 WL 3890320, at *10 (S.D. Fla. July 26, 2019) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010)). Summary judgment is proper where no reasonable jury

---

[5] Notably, the analysis of Florida's statutory and common law claims of trademark infringement and unfair competition (here, Counts III and IV) is "the same as under the federal trademark infringement claim." *Gift of Learning Found., Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir. 2003).

[6] The stronger the mark, the greater the scope of protection afforded to it. *Frehling*, 192 F.3d at 1335. In determining a mark's strength there are four categories of distinctiveness, which provide increasing levels of protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *Id.* These categories are based on the relationship between the name and the service or good it describes. *Id.* An arbitrary mark is a "word or phrase that bears no relationship to the product" and it is the strongest of the four categories. *Id.* at 1335–36.

could find a likelihood of confusion, even if some of the factors weigh in the plaintiff's favor. *Id*. "While there is no bright line test to determine the existence of a likelihood of consumer confusion, recovery under the Lanham Act requires, at a minimum, 'that confusion, mistake, or deception be likely, not merely possible.'" *Wreal,* 2019 WL 3890320, at *10 (quoting *Custom Mfg.*, 508 F.3d at 651)).

## **DISCUSSION**

A. *Defendant's Motion for Summary Judgment*

1. Counts I-V of the FAC

At the outset it is undisputed that Plaintiff's IMVEXXY mark has priority over Defendant's PHEXXI mark.  It is also undisputed that IMVEXXY is an arbitrary mark, which is the strongest category and thus it is entitled to the highest protection (ECF No. 112 at 10, n.2), so the first factor (and one of the two most important factors) weighs in Plaintiff's favor.  Thus, I will consider the remaining six factors set forth by the Eleventh Circuit for assessing likelihood of confusion.

*Similarity of Marks*

In assessing the similarity of two marks, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337. "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features."  *Wreal,* at *14 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir. 1980)). "In evaluating the similarity of marks, [the court] must consider the overall

impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).

Here, viewing the evidence in the light most favorable to Plaintiff as the non-moving party, I find that Plaintiff has put forth sufficient evidence such that a reasonable fact finder could find in its favor. Even though each product name has a different number of syllables, and the marks use different colors and fonts, the evidence demonstrates a strong similarity in the spelling and sound of the marks. Defendant concedes that "both marks include the letters 'XX' and end in an 'exy' sound." ECF No. 112 at 10. It is also significant that the FDA's analysis gave the PHEXXI/IMVEXXY name pair a POCA score of 59% which corresponds to the category of "moderately similar names" for purposes of "determin[ing] whether a name presents a safety concern from a look-alike or sound-alike perspective." ECF No. 125-5 at 12.[7] Even though the FDA did not find the names to be "highly similar" which requires a score of 70%, a factfinder could consider the 59% rating to be a high

---

[7] In *Kos Pharms., Inc. v. Andrx Corp.,* the Third Circuit rejected defendant's claim that there could be no confusion under the Lanham Act because "[t]he FDA and the USPTO have determined that the marks are not confusingly similar." *Id.,* 369 F.3d 700, 714 (3d Cir. 2004). The Court noted that "neither of those proceedings can supplant the required Lanham Act analysis [because] the FDA applies a standard different . . . review[ing] proposed drug names 'to predict potential confusion that may arise in the actual prescription process.'" *Id.* (citations omitted).

enough score to establish likelihood of confusion for purposes of trademark infringement.[8]

Moreover, Plaintiff's expert, Dr. Disner, an experienced linguist, analyzed the orthographic and phonetic attributes of IMVEXXY and PHEXXI and opined that the marks share numerous similarities, "including (i) similar letters; (ii) similar sounds; (iii) similar word stresses; (iv) interchangeability of some of the sounds; (v) unique distribution of other sounds (such as -xx-); and (vi) auditory weakness of the first syllable – [that] make it difficult to distinguish PHEXXI from IMVEXXY."  ECF No. 111-9 at 4-5.  A reasonable factfinder could credit this testimony in support of a finding that the marks are similar.

Finally, the internal emails exchanged by Defendant's employees in January of 2020 reveal their belief that the names were "too close" and "so similar" (ECF No. 166-8 at 7-8) that they worried Defendant "might be back to the drawing board." *Id.* Given these facts, which I must consider in the light most favorable to Plaintiff, I find that this factor weighs in Plaintiff's favor.

<u>*Similarity of Products*</u>

"This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public

---

[8]  The FDA ultimately concluded that there were "sufficient differences" between the two marks based in part on their differing dosages and product strengths.  A finder of fact might not place such a heavy emphasis on these characteristics in assessing likelihood of confusion.

can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338 (citing *E. Remy Martin*, 756 F.2d at 1530).

Here, Plaintiff has demonstrated that there are sufficient similarities between the products such that a factfinder could determine that the public might reasonably attribute them to a single source. Even though the products' marketing targets women in different stages of life, both products are prescribed to sexually active women by their OB/GYN's; both products are applied vaginally and intended to address concerns regarding sexual intercourse. Moreover, viewing the facts in the light most favorable to Plaintiff, I must consider the declarations and testimony of Plaintiff's pharmaceutical sales representatives who described instances where a prescriber or the office staff, believed that IMVEXXY and PHEXXI were products offered by the same company. *See, e.g.,* Jordan Harwell Decl. (ECF No. 167-4); Tammy Czar Decl. (ECF No. 167-5); Jillian Brierley Decl. (ECF No. 167-6). Therefore, this factor weighs in Plaintiff's favor.

            *Similarity of Trade Channels and Customers*

"This factor takes into consideration where, how, and to whom the parties' products are sold." *Frehling,* 192 F.3d at 1339. "Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, though evidence that the products are sold in the same stores is certainly strong. The parties' outlets and customer bases need not be identical, but some degree of overlap should be present." *Id*. (internal citation omitted).

The evidence here is sufficient to demonstrate "some degree of overlap" between the two products. Again, the products are prescribed by OB/GYN's, dispensed by pharmacies, and used by sexually active women. The products are marketed by pharmaceutical sales representatives to OB/GYN's who provide samples and prescriptions to their sexually active female patients. This factor weighs in Plaintiff's favor.

### Similarity of Advertising Methods

"As the heading suggests, '[t]his factor looks to each party's method of advertising.'" *Wreal,* at *20 (quoting *Frehling*, 192 F.3d at 1339). Notably, Defendant does not address this factor in its response papers and so it appears that Defendant concedes that this factor weighs in Plaintiff's favor. Suffice it to say that both products are advertised via print, digital, samples, tele-sales, conferences, and meetings. ECF No. 166-1 at 16.

### Defendant's Intent

The court must determine whether the defendant "adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation . . ." *Frehling*, 192 F.3d at 1340. Plaintiff argues that Defendant "intentionally disregarded" warnings about the similarities between the two marks. Specifically, Plaintiff relies on (i) the internal emails by Defendant's employees revealing concerns that the names were "too close," (ii) the email from Defendant's branding company acknowledging the similarities in the names, and (iii) the pre-suit communications from Plaintiff's counsel regarding possible confusion between the two marks. ECF

16

No. 166-1 at 17.  Defendant counters, without direct evidence, that its employees' emails reflect concerns that the FDA would not approve the PHEXXI name, but that these concerns disappeared once Defendant received FDA approval.

At the summary judgment stage, I am precluded from considering Defendant's explanation of its employees' emails.  I must view the evidence in the light most favorable to Plaintiff as the non-moving party.  Nevertheless, even viewed in the light most favorable to Plaintiff, I do not find that the evidence is sufficient to show that Defendant's chose to use the PHEXXI mark with the intent of deriving a benefit from Plaintiff's business reputation.  Although the evidence shows that Defendant was aware of the similarities between the two marks, the evidence also shows that there were reasonable grounds for Defendant to believe that its mark and product were sufficiently distinct from Plaintiff's mark and product to negate any likelihood of confusion.  *See, e.g.,* the FDA's approval and The Brand Institute's opinion (ECF No. 125-5; 166-4).

Moreover, there is no objective evidence of Defendant's intent to benefit from Plaintiff's mark.  The facts here are distinguishable from those in *Frehling*, where after the USPTO rejected the defendant's trademark application because of the likelihood that it would be confused with the plaintiff's mark, the defendant continued to use the mark and even adopted a toll-free number (1-800-OGGETTI) which "constitute[d] a direct replication" of the plaintiff's mark.  *Id.,* 192 F.3d at 1340.  The Eleventh Circuit found this to be "particularly indicative of improper intent."  *Id.*

17

Here, Defendant explained the origin of the PHEXXI mark and why it was specifically chosen. That explanation, which is undisputed, has nothing to do with the name being similar to IMVEXXY. Given that there is no evidence that Defendant intended to benefit from Plaintiff's mark, this factor weighs in Defendant's favor.

### *Actual Confusion*

"[E]vidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling*, 192 F.3d at 1340 (citing *John H. Harland Co.*, 711 F.2d at 978); *see also Tana*, 611 F.3d at 779 ("[A]ctual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion.").

Here, the parties dispute who is the relevant consumer. Plaintiff's expert, Dr. Wind, surveyed prescribers and patients and concluded that "there is a high likelihood of confusion between PHEXXI and IMVEXXY." Defendant's expert, Dr. Neal, initially only surveyed pharmacists and found no evidence of confusion. Dr. Neal later surveyed prescribers and also found zero percent of them were likely to confuse the two brands.

As an initial matter, I note that the parties' differing views on who is the relevant consumer constitutes a disputed issue of a material fact, which precludes the entry of summary judgment. Were I to consider these conflicting expert opinions, I would be obligated to do so in the light most favorable to Plaintiff, and thus, I must accept Dr. Wind's opinion that prescribers and patients are the relevant consumer groups and that there is a high likelihood that they would be confused. This finding also precludes the entry of summary judgment in Defendant's favor.

Aside from the competing expert reports, Plaintiff has produced evidence of actual confusion by prescribers and their staff in the form of numerous declarations and depositions by Plaintiff's pharmaceutical sales representatives. These representatives detail interactions with assorted medical staff who did not appreciate the differences between IMVEXXY and PHEXXI in that they attributed the characteristics of one product (such as its purpose, efficacy, cost and insurance coverage) with the other product's name; they also displayed confusion about the corporate origins of each product. These sworn statements provide compelling evidence of actual confusion.

Defendant makes a broad-sweeping argument that all of the depositions and declarations produced by Plaintiff's pharmaceutical representatives should be deemed inadmissible hearsay. Notably, Defendant does not identify the specific statements that it contends are hearsay. A closer examination of the declarations demonstrates why Defendant's overarching hearsay objection is flawed.

For example, in the declaration of Erica Tague, she stated that she went to an OB/GYN office to drop off samples of Plaintiff's products and a doctor asked her, "Could you tell me why my patients would pay $300 for IMVEXXY?" ECF No. 167-3 ¶ 19. The doctor told the sales rep that her patient was in her 20's and had health insurance. *Id.* at ¶ 21. These statements, neither of which are being introduced for the truth of the matter asserted, revealed to the sales rep that the doctor was

confusing IMVEXXY and PHEXXI because IMVEXXY is covered by insurance and is not typically prescribed to women in their twenties.[9]

Similarly, the declaration of Tammy Czar states that when she went to a Women's Care clinic, the receptionist pointed to some PHEXXI brochures and told the sales rep that one of her colleagues had recently visited.  ECF No. 167-5 at ¶¶ 5, 7, 8.  Again, the receptionist's statement is not being offered to prove the truth of the matter asserted, but to demonstrate confusion between the two products as witnessed by a sales rep.

In other words, at least some of the sales representatives' declarations and testimony do not constitute hearsay because they are based on firsthand observations, introduced to show the sales representative's impression of her interaction with the doctor and/or staff, and are not offered to prove the truth of the matter asserted.[10]  As the Eleventh Circuit has held "the quantum of evidence needed to show actual confusion is relatively small." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010) (citation omitted).

Defendant argues that the declarations of the sales representatives only reveal "momentary and fleeting" confusion and thus do not demonstrate a likelihood of

---

[9] The doctor's confusion was later confirmed by a medical assistant in the office.  ECF No. 167-3 ¶¶ 24, 25.

[10]  My findings are in no way controlling over any evidentiary issues Judge Ruiz may rule on at trial, but simply to show that Plaintiff has offered at least some admissible evidence of actual confusion sufficient to defeat Defendant's motion for summary judgment on Counts I-V.

confusion that would impact Plaintiff's sales. ECF No. 112 at 19-20. I reject this argument because Defendant does not support its contention with any evidence in the record.

Similarly, I reject Defendant's reliance on a recent case where the court refused to consider evidence of customer confusion because the evidence presented was hearsay. ECF No. 194. In *Unisource Discovery, Inc.,* the plaintiff's CEO and operations manager stated that they began receiving calls and emails from their customers in Florida complaining that their orders had been lost because they had mistakenly sent their orders to the defendant's company in California (with a nearly identical name) resulting in lost business for the plaintiff. The plaintiff attempted to introduce reports generated by the CEO "of what he perceived as customer complaints" to show evidence of customer confusion, but the court rejected the reports as inadmissible hearsay. *Unisource Discovery, Inc. v. Unisource Discovery, LLC*, No. 20-23276-CIV, 2022 WL 457843, at *3 (S.D. Fla. Jan. 10, 2022), report and recommendation adopted, No. 1:20-CV-23276, 2022 WL 580443 (S.D. Fla. Feb. 25, 2022). I find the facts in *Unisource* distinguishable from the facts here.

In sum, I find that Plaintiff has produced sufficient evidence of actual confusion in the marketplace for this factor to weigh in Plaintiff's favor. Given that six of the seven factors used to assess the likelihood of consumer confusion (including the two most important factors) weigh in Plaintiff's favor, I find that Plaintiff has put forth evidence sufficient to defeat Defendant's motion for summary judgment on Counts I-V.

2.  Corrective Advertising Damages

Defendant seeks summary judgment dismissing Plaintiff's request for an award of corrective advertising damages, claiming that Plaintiff "does not allege a single lost sale or that [Defendant] has made a single penny from [Plaintiff's IMVEXXY] mark."  ECF No. 112 at 22.  According to Defendant, Plaintiff cannot recovery corrective advertising damages because the products at issue do not compete with each other.

"In actions brought for infringement under the Lanham Act, damages consist of '(1) the defendant's profits, (2) any damages sustained by the plaintiff and (3) the cost of the action,' and include all elements of injury to the plaintiff's business, such as the costs of corrective advertising or injury to business reputation or good will." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1279 (S.D. Fla. 2013) (quoting *Aronowitz v. Health–Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (affirming corrective advertising damages award based on CFO's estimation of costs to develop corrective website, running ads in trade publication, and attending industry trade shows to address confusion caused by website with infringing name)).

Plaintiff claims that its damages include (i) diminution in the distinctiveness or strength of the IMVEXXY mark; (ii) confusion among healthcare providers; (iii) confusion among consumers; (iv) conflation of PHEXXI's negative attributes with IMVEXXY which creates a false association; (v) loss of control of its branding message; (vi) unauthorized use of IMVEXXY and its associated goodwill by

Defendant's sale's representatives to gain access to healthcare providers; and (vii) interference with limited sales time to dispel confusion among healthcare providers. ECF No. 166-1 at 28. The record before me contains sufficient evidence to support these claimed damages and a reasonable factfinder could conclude that Plaintiff is entitled to damages to restore the value of its mark.

Notably, Defendant does not cite any Eleventh Circuit case law for the proposition that evidence of lost sales is a prerequisite to an award of corrective advertising damages. Likewise, the Eleventh Circuit has not specifically limited recovery of corrective advertising damages to infringement involving competing products. Accordingly, I find that Defendant's motion for summary judgment on Plaintiff's claim for corrective advertising damages should be denied.

I also reject Defendant's claim that any corrective advertising damages award should be capped at $143,000. Defendant's expert arrived at this calculation based on valuations listed in Plaintiff's SEC filings, which Plaintiff argues have been misrepresented by Defendant's expert. ECF No. 166-1 at 29. In a separate order on the parties' *Daubert* motions, I recommended that Defendant be permitted to present its expert's opinion to the finder of fact, and that Plaintiff be permitted to present the opinion of its expert, who unsurprisingly, suggests that a much larger damages award is warranted. The factfinder should decide which opinion to credit and how much, if any, damages are owed to Plaintiff.

3.   <u>Count VI of the FAC</u>

Count VI of the FAC seeks cancellation of Defendant's '656 trademark based upon a purported fraud on the USPTO.   According to Plaintiff, Defendant's application with the USPTO contained a Statement of Use signed by Defendant's Deputy General Counsel, Stewart Brown, attesting that the PHEXXI "mark is in use in commerce on or in connection with all of the goods [listed]" and that "the mark was first used by the applicant . . . at least as early as 09/08/2020."  FAC ¶ 93.  One of the "goods" listed was "pharmaceutical preparations, namely, microbicidal that creates an inhospitable environment for viral and bacterial pathogens."   *Id.* at ¶ 97. According to Plaintiff, "at the time [Defendant] filed the Statement of Use, [it] was not using and had never used the PHEXXI Mark in commerce" for this purpose and that Mr. Brown knew this.   *Id.* at ¶¶ 97, 100.  Plaintiff contends that PHEXXI had only been approved by the FDA to be marketed as a vaginal gel for the prevention of pregnancy.  *Id.* at ¶ 98.   According to Plaintiff, Mr. Brown submitted the false Statement of Use to the USPTO "with the intent to procure a registration to which [Defendant] is not entitled."   *Id.* at ¶ 106.  Plaintiff contends that Defendant only submitted certain sides of its product packaging to the USPTO, and intentionally omitted the side containing a disclaimer that PHEXXI does not protect against sexually transmitted diseases.  *Id.* at ¶¶ 109, 111, 112.

As noted above, the facts surrounding the purposes for which PHEXXI was being used at the time Defendant filed its application with the USPTO, as well as the basis for Mr. Brown's knowledge and beliefs at the time he signed the Statement of

Use, remain very much in dispute, which preclude the entry of summary judgment. A person's subjective intent is generally an issue of fact. Moreover, courts are precluded from assessing a witness's credibility at the summary judgment stage. In any event, I find that the record contains sufficient evidence such that a reasonable finder of fact could find in Plaintiff's favor on Count VI and so Defendant's motion for summary judgment on this count should be denied.

### 4. Defendant's Counterclaim

Similarly, Defendant's counterclaim seeking cancellation of Plaintiff's mark for IMVEXXY is based on asserted uses stated in its trademark application with the USPTO. According to Defendant, Plaintiff's Statement of Use to the USPTO differs from the FDA-approved uses for IMVEXXY because it does not treat all the symptoms of VVA. Def. SOF ¶¶ 53-55; Def. Resp. to PAF ¶ 87. Plaintiff counters that IMVEXXY treats all symptoms of VVA. Plaintiff's SOF ¶ 34, Plaintiff's Resp. to Def. SOF ¶ 54; PAF ¶ 87.

As with Plaintiff's claim seeking cancellation of a trademark, Defendant's counterclaim involves disputed issues of fact and credibility determinations rendering it unsuitable for resolution on summary judgment. Given that Defendant has not affirmatively demonstrated the absence of a genuine issue of material fact, summary judgment on the counterclaim should be denied.

B. *Plaintiff's Motion for Partial Summary Judgment*

1.  Defendant's Affirmative Defenses

Plaintiff moves for summary judgment on Defendant's affirmative defenses for waiver, laches and estoppel (First Aff. Def.), invalidity of Plaintiff's trademark registration due to abandonment (Second Aff. Def.), and unclean hands (Fourth Aff. Def.).  ECF No. 110 at 11-12.

a.  *First Affirmative Defense –waiver, laches and estoppel*[11]

Defendant's First Affirmative Defense alleges that Plaintiff "unreasonably delayed in asserting some or all of is purported claims and unreasonably led [Defendant] to believe that it was acquiescing in or waiving its right to assert purported rights, thereby prejudicing [Defendant]."  ECF No. 110 at 11.  According to Defendant, this affirmative defense is based on the allegations in Paragraph 34 of the FAC and Defendant's Answer, which state as follows:

> On or about May 28, 2020, [Plaintiff] contacted [Defendant] to discuss [Plaintiff's] concerns regarding the likelihood of confusion between the IMVEXXY mark and the PHEXXI marks in connection with pharmaceutical drugs for women's sexual and reproductive health. [Defendant] chose not to withdraw its proposed trademark applications and subsequently commercially launched its product under the PHEXXI mark.

---

[11]  In its response papers, Defendants states that it "has elected not to proceed with its affirmative defenses of waiver, laches and acquiescence."  ECF No. 172-1 at 3, n.1.  Defendant's Answer did not specifically list acquiescence as an affirmative defense, nevertheless, this leaves only estoppel for this Court to address.  In its reply, Plaintiff notes that Defendant's Answer "has not been amended to formally remove these defenses" and so Plaintiff requests the entry of summary judgment on these now-abandoned affirmative defenses "to preclude a future revival" of them.  ECF No. 188-1 at 6-7.

FAC at ¶ 34.

> [Defendant] [a]dmits that on or about May 28, 2020, counsel for [Plaintiff] contacted counsel for [Defendant], that [Defendant] denied the claims of infringement, and that [Plaintiff's] counsel conveyed that no action would be taken at that time and that if [Plaintiff] determined the need to take action later, counsel would notify [Defendant] of that prior to taking any action. [Defendant] otherwise denies the allegations of Paragraph 34 of the FAC and notes that counsel never contacted [Defendant] again prior to bringing this action.

Answer at ¶ 34.

In its Statement of Material Facts, Plaintiff does not appear to dispute Defendant's version of this communication between counsel, although neither attorney participating on the May 2020 call gave their deposition during discovery. ECF No. 128-1 at 12. Plaintiff's Statements of Material Facts concedes the deposition testimony provided by Defendant's Deputy General Counsel Stewart Brown:

> 12. [Defendant] asserts, based on the May 28, 2020, phone call, that "[Mr. Fitzpatrick's] understanding, as conveyed to me -- again, I wasn't a party to this call -- [Mr. Fitzpatrick's] understanding as conveyed to me was that the temperature of all of this was very low. **[Plaintiff] was merely preserving its rights** and if it should ever decide to sue us, it would contact us first and give us an opportunity to resolve it without litigation." Ex. A, Brown Dep. Tr. at 179:7-10.

> 13. [Defendant] asserts, based on the May 28, 2020 phone call, that "[Y]ou [Plaintiff] assured us [Defendant] that you wouldn't [sue] without giving us a heads up. . . . A pre-filing heads up as was promised." Ex. A, Brown Dep. Tr. at 180:2-9.

Plaintiff's SOF (ECF No. 128-2) ¶¶ 12, 13 (emphasis added). Defendant's response includes some additional facts:

> 12. Disputed. While [Defendant] does not dispute the accuracy of the quote, it disputes that the quote reflects the complete understanding of the parties. Indeed, Mr. Brown testified in response to the very next question that [Defendant] did not believe that it was "in any way likely"

that [Plaintiff] would file suit and that [Defendant] "didn't expect to be sued by you guys" because "the case doesn't have any merit." Ex. 2, Excerpt of Deposition of Stewart Brown, dated May 28, 2021 ("Brown Dep. Tr."), 179:12-180:5. The reasonableness of [Defendant's] understanding of the May 2020 call and its reliance thereon is also evident from later confirmatory representations from [Plaintiff's] own in-house counsel after the litigation was filed, but before it was served. Indeed, [Plaintiff's] in-house counsel represented that they did not "think this case is very strong" and they "didn't want to bring it," but the "business people [were] making [them] do this." Brown Dep. Tr. 170:20-25; 176:7-178:15 . . .

13. Disputed. While [Defendant] does not dispute the accuracy of the quote, it disputes that the quote reflects the complete understanding of the parties. Indeed, the quote omits the portion of the response where Mr. Brown clarifies that part of the reason that [Defendant] did not believe that suit was likely is that "the case doesn't have any merit." *Id.* at 180:2-5.

Def. Resp. to Plaintiff's SOF (ECF No. 161) at ¶¶ 12, 13.

Thus, Plaintiff asserts that even assuming Defendant's version of the facts are true, they serve to establish that Plaintiff preserved its rights to bring an infringement lawsuit and therefore, there was no basis for Defendant to believe that Plaintiff was acquiescing or waiving its rights. Moreover, Plaintiff contends that it could not have filed its infringement lawsuit before PHEXXI's September 2020 launch, and that the three months between PHEXXI's launch and Plaintiff's filing of this lawsuit in December 2020, was not unreasonable. ECF No. 128-1 at 6, 16. Moreover, it is undisputed that Defendant received notice from the USPTO in October 2020 that Plaintiff intended to oppose the PHEXXI trademark applications. Plaintiff's SOF ¶¶ 19-21.

In response, Defendant contends that the relevant time period is the seven months between the May 2020 phone call and the December 2020 filing of this

lawsuit, during which time Defendant "relied on [Plaintiff's] representations" and made "significant investments in the PHEXXI brand, which it otherwise may not have made had it known that [Plaintiff] would bring this challenge." ECF No. 172-1 at 4.

The elements of federal common law equitable estoppel are: "(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation." *Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013) (citation omitted).

I find that there is no genuine dispute over these material facts, and that Defendant, as the non-moving party has not met its burden to show that a reasonable trier of fact could find in its favor on its First Affirmative Defense. Rather, I find as a matter of law that it was not reasonable for Defendant to rely upon Plaintiff's statement that they would contact Defendant before any lawsuit was filed. The undisputed facts establish that Defendant understood in the May 2020 call that Plaintiff was preserving its right to file an infringement lawsuit. That Defendant may have expected a courtesy call before the lawsuit was filed would not have changed the fact of the lawsuit. Defendant has not put forth any evidence to show that it would have withheld investment in the PHEXXI brand or was considering

changing its product name during this time period to avoid a lawsuit but decided against these precautions based on Plaintiff's assurances, thus, belying Defendant's clam of prejudice. Accordingly, I find that Plaintiff is entitled to summary judgment in its favor on Defendant's First Affirmative Defense.

### b. *Second Affirmative Defense – invalidity of trademark registration due to abandonment*

In its Answer, Defendant's Second Affirmative Defense is as follows:

> TXMD's claims are barred, in whole or in part, because its purported trademark registration is invalid, unenforceable, and subject to cancellation because TXMD abandoned any rights it had in the purported registration through non-use of the only good covered by that registration. The allegations set forth in the below Counterclaim are incorporated herein by reference.

ECF No. 110 at 11.

"The affirmative defense of abandonment requires a defendant to demonstrate that a trademark plaintiff no longer holds the rights to a mark." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002). "Abandonment is trademark law's way of recognizing that "[t]rademark rights flow from use." *Id.* (citation omitted). Thus, a defendant must prove two separate elements to raise the defense of abandonment successfully: "that the plaintiff has ceased using the mark in dispute, and that he has done so with an intent not to resume its use." *Id.*

Like Defendant's counterclaim, this affirmative defense stems from Defendant's claim that Plaintiff's Statement of Use to the USPTO differs from the FDA-approved uses for IMVEXXY because it does not treat all the symptoms of VVA.

30

Plaintiff counters that IMVEXXY treats all symptoms of VVA. Consistent with my ruling above, this affirmative defense involves disputed issues of material fact that preclude a disposition on summary judgment. Given the conflicting evidence on this subject, Plaintiff has not met its burden of showing the absence of a genuine issue of material fact and accordingly, summary judgment on Defendant's Second Affirmative Defense should be denied.

### c.  *Fourth Affirmative Defense – unclean hands*

In asserting an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing. *Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (citing *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993). "[C]ourts require the connection between the unclean-hands conduct and the matter in litigation to be very close." *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 11233137, at *3 (S.D. Fla. June 26, 2015) (granting summary judgment to plaintiff on unclean hands defense because alleged misrepresentation was not directly related to the lawsuit). As one court put it, "we're talking *really* directly related . . . [i]t is, in essence, the reason for the lawsuit." *Gastaldi v. Sunvest Resort Communities, LC*, No. 08-62076-CIV, 2010 WL 457243, at *9 (S.D. Fla. Feb. 3, 2010) (emphasis in original).

In its Answer, Defendant's Fourth Affirmative Defense states as follows:

> TXMD's claims are barred in whole or in part by TXMD's unclean hands
> including that TXMD is pursuing these claims for improper purposes
> arising out personal animus and to stifle competition given TXMD's
> entry into a market competitive with Evofem's product. Tommy

Thompson, the current Chairman of the Board of TXMD, was previously ousted as the board chair of Evofem and blames the current CEO of Evofem, Saundra Pelletier. That animosity has motivated TXMD's pursuit of this litigation. As well, Thompson had pushed TXMD to acquire a contraceptive product called Annovera, which Evofem had previously marketed but dropped from its product line. TXMD's Annovera product currently competes with Evofem's PHEXXI product. Fueled by Thompson's animosity and a desire to harm Evofem's business to gain a competitive advantage for its Annovera product, TXMD is pursuing this litigation with an improper ulterior motive and for anti-competitive purposes.

ECF No. 110 at 12.

In its responsive Statement of Facts, Defendant contends that

Ms. Pelletier reasonably believes that TXMD brought this litigation at the behest of Evofem's ousted chairman, and current TXMD board member, Tommy Thompson. Mr. Thompson was "extremely upset" following his ouster, and "blamed" Pelletier . . . [and that] he is the driving force behind this baseless litigation and that TXMD is using this baseless litigation solely as a means to stifle competition between PHEXXI and ANNOVERA (a drug for which no infringement is asserted).

ECF No. 161 at 9-10.

Thus, is appears that Plaintiff's alleged wrongdoing is that it (1) acquired a contraceptive product that competes with PHEXXI and (2) brought this lawsuit for improper anti-competition purposes.

As an initial matter, I find that Plaintiff's acquisition of a competing contraceptive product, even if motivated by a "personal animus" that Plaintiff's CEO felt towards Defendant's CEO, cannot sustain an unclean hands defense. First, Plaintiff's acquisition of a competing product does not constitute wrongdoing. *Regions Bank v. Old Jupiter, LLC*, No. 10-80188-CIV, 2010 WL 5148467, at *5 (S.D. Fla. Dec. 13, 2010) ("'unclean hands' applies when a party seeking equitable relief has

32

committed an *unconscionable act* immediately related to the equity the party seeks in respect to the litigation") (emphasis added) aff'd, 449 F. App'x 818 (11th Cir. 2011). Second, even if the alleged motivation for Plaintiff's acquisition of a competing product is true, it is irrelevant and unrelated to this lawsuit, which seeks to determine whether the PHEXXI mark is confusingly similar to the IMVEXXY mark.

As for Defendant's allegation that this lawsuit was brought for anti-competition purposes, as opposed to a legitimate concern about the similarity of the PHEXXI and IMVEXXY marks, I find that is speculative, and that in any event, it rests on the faulty premise that this litigation is "baseless." ECF No. 172-1 at 14. Given my analysis above and my recommendation that Defendant's motion for summary judgment be denied, I must reject Defendant's argument that Plaintiff's trademark infringement lawsuit is frivolous. Summary judgment should be entered in Plaintiff's favor on Defendant's unclean hands affirmative defense.

2. Defendant's Counterclaim

Finally, Plaintiff seeks the entry of judgment in its favor on Defendant's counterclaim which seeks cancellation of Plaintiff's IMVEXXY mark due to abandonment/non-use. As noted above, this claim involves material facts that are in dispute and viewing those facts in the light most favorable to Defendant as the non-moving party, I find that Defendant has put forth sufficient facts such that a reasonable trier of fact could find in its favor on this counterclaim.

## RECOMMENDATION

WHEREFORE, I **RECOMMEND** as follows:

1.     Defendant's Motion for Summary Judgment (ECF No. 112) should be **DENIED;**

2.     Plaintiff's Motion for Partial Summary Judgment (ECF No. 128-1) should be **GRANTED IN PART AND DENIED IN PART** with judgment entered in Plaintiff's favor on Defendant's First and Fourth Affirmative Defenses; and

3.     Plaintiff's Motion to Strike Defendant's Fourth Affirmative Defense (ECF No. 124) should be **DENIED AS MOOT.**

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Rodolfo A. Ruiz, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 29th day of March, 2022, at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE